FILED

2014 Mar-28  PM 01:27
U.S. DISTRICT COURT
N.D. OF ALABAMA

### UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF ALABAMA
### EASTERN DIVISION

| | | |
|---|---|---|
| **CONNIE WILLIAMS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CASE NO. 1:12-cv-3869-SLB** |
| | ) | |
| **GENERAL ELECTRIC,** | ) | |
| | ) | |
| **Defendant.** | ) | |

### MEMORANDUM OPINION

This case is before the court on defendant's Motion to Dismiss or, in the Alternative, to Stay this Action and to Compel Arbitration. (Doc. 7.)[1] Upon consideration of the record, the submissions of the parties, and the relevant law, the court finds that defendant's Motion is due to be denied.

### STATEMENT OF FACTS

On January 16, 1995, plaintiff Connie Williams ("plaintiff") began working for defendant General Electric ("defendant") at its Decatur, Alabama plant as a Processor I. (Doc. 1 ¶ 9; doc. 8-1 ¶ 3.)  Plaintiff remains employed with defendant to date.  (Doc. 8-7 ¶ 8.)

In December of 2009, defendant developed and implemented a four-step internal dispute resolution process called "SOLUTIONS."  (Doc. 8-1 ¶ 5; *see generally* doc. 8-2.)

---

[1]Reference to a document number, ["Doc. ___"], refers to the number assigned to each document as it is filed in the court's record.

The SOLUTIONS handbook provides that "covered employees," which include hourly and salaried employees at the Decatur plant, must bring "covered claims" through the SOLUTIONS multi-tiered dispute resolution process. (Doc. 8-1 ¶ 5; doc. 8-2 at 3, 5-6.) "Covered claims" are "all claims that arise out of or are related to an employee's employment," including, but not limited to, "[e]mployment discrimination and harassment claims, based on . . . age, race, sex, religion, national origin, veteran status, citizenship, handicap/disability, or other characteristic protected by law" and "[r]etaliation claims for legally protected activity and/or for whistleblowing." (Doc. 8-2 at 6.) The SOLUTIONS handbook states: "This Procedure . . . creates a binding obligation on Covered Employees and the Company for the resolution of employment disputes." (*Id*. at 3.) The handbook further states that "Covered Employees . . . are not allowed to litigate a Covered Claim in any court. . . . All covered claims must be brought on an individual basis only in Solutions." (*Id*. at 8.)

In November of 2009, defendant first introduced SOLUTIONS to its Decatur plant employees through a Newsletter.[2] (Doc. 8-1 at 3.) The Newsletter provided an overview of the SOLUTIONS process and stated that "all U.S. employees based in the U.S. . . . or elsewhere (hourly or salary) who continue their employment[] will be deemed covered by this procedure." (Doc. 8-3 at 2.) Employees received hard copies of the Newsletter and defendant made the Newsletter accessible on the Decatur plant's intranet. (Doc. 8-1 ¶ 6.) In

---

[2]When capitalized, "Newsletter" refers to doc. 8-3 at 2.

April of 2010, the Business Team Leaders asked each employee at the Decatur plant to sign a SOLUTIONS Program Acknowledgment Form (the "Acknowledgment Form"). (*Id.*; *see* doc. 8-4 at 3.) The Acknowledgment Form states: "Signing this form indicates that you have received an overview of SOLUTIONS and that you have been informed as to where you can access SOLUTIONS information later." (Doc. 8-4 at 3.)[3] Plaintiff received the SOLUTIONS Overview[4] and signed the Acknowledgment Form. (Doc. 8-1 ¶ 6; doc. 8-4 at 3.)

On about April 20, 2011, plaintiff had a "flare up" of preexisting injuries causing her significant pain. (Doc. 1 ¶ 11.) On July 20, 2011, plaintiff received a disciplinary letter from Business Team Leader Kathy Wright ("Wright") in which Wright claimed that plaintiff had given the company untimely notice of her medical absence on July 15, 2011. (Doc. 8-5 at 2.) After receiving Wright's letter, plaintiff submitted a letter of complaint to defendant's Human Resources department, claiming that Wright treated her unfairly and that she had informed Wright of her absence on July 13, 2011. (Doc. 8-6 at 2-3.)

On August 31, 2011, plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") against defendant alleging race and disability discrimination based on the events surrounding her July 15, 2011 absence. (Doc.

---

[3]Employees were notified that a SOLUTIONS handbook could be accessed through a Human Resources representative. (Doc. 8-1 ¶ 7.)

[4]When capitalized, "Overview" refers to doc. 8-4 at 2.

1 at 6.)  On August 24, 2012, plaintiff filed an amended EEOC Charge alleging that defendant retaliated against her for filing the August 31, 2011 charge "by adding harder jobs to [her] position and denying [her] a reasonable accommodation."  (Doc. 8-8 at 3.)  On November 14, 2012, plaintiff filed this lawsuit against defendant pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* ("Title VII") and 42 U.S.C. § 1981 ("section 1981"), asserting claims for race and disability discrimination and retaliation. (*See generally* doc. 1.)

On February 19, 2013, defendant filed the instant Motion to Dismiss, or in the Alternative, to Stay this Action and to Compel Arbitration.  (Doc. 7.)  In it, defendant requests that the court compel arbitration pursuant to § 4 of the Federal Arbitration Act, 9 U.S.C. § 4, (doc. 7 at 1), or stay this proceeding pending completion of arbitration of all arbitrable issues pursuant to § 3.  (*Id.* at 5.)  Attached to the Motion is a declaration from defendant's Human Resources Manager during the relevant time period stating that plaintiff never sought resolution of her grievances through SOLUTIONS. (Doc. 8-1 ¶ 10.) Plaintiff, who is proceeding *pro se*, responds that she attempted to invoke but was denied access to the SOLUTIONS process, and that she will not sign the "solutions process forms" because they will deny her her rights. (Doc. 11 at 1.)

## STANDARD OF REVIEW

Congress enacted the  Federal Arbitration Act ("FAA") to reverse longstanding judicial hostility toward arbitration agreements and to place them on the same footing  as other contracts. *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 111 (2001); *Gilmer  v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 24 (1991); *Shearson/American Express, Inc. v. McMahon*, 482 U.S. 220, 225-26 (1987). Congress' preeminent goal in passing the FAA "was to enforce private agreements into which parties had entered." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 625-26 (1985); *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 221 (1985). The FAA "makes a written agreement to arbitrate 'in . . . a contract evidencing a transaction involving commerce . . . valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.'" *Mitsubishi Motors*, 473 U.S. at 625 (quoting 9 U.S.C. § 2). "The FAA also provides for stays of proceedings in federal district courts when an issue in a proceeding is referable to arbitration, § 3, and for orders compelling arbitration when one party has failed, neglected, or refused to comply with an arbitration agreement, § 4." *Gilmer*, 500 U.S. at 25. The Supreme Court has declared that these provisions manifest a "liberal federal policy favoring arbitration agreements." *Id.* (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983)). Of course, that policy only extends insofar as an agreement actually exists: "whether parties have agreed to submit a particular dispute to arbitration is typically an issue for judicial determination." *Granite Rock Co. v. Int'l Bhd. of*

5

*Teamsters*, 561 U.S. 287, 130 S. Ct. 2847, 2855 (2010). "When deciding whether the parties agreed to arbitrate a certain matter . . . courts generally . . . should apply ordinary state-law principles that govern the formation of contracts." *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995). "Courts should not assume that the parties agreed to arbitrate arbitrability unless there is 'clea[r] and unmistakabl[e]' evidence that they did so." *Id.* (quoting *AT&T Tech., Inc. v. Comm. Workers of America*, 475 U.S. 643, 649 (1986)).

Arbitration clauses "are therefore interpreted according to ordinary state-law rules of contract construction." *Paladino v. Avnet Computer Techs., Inc.*, 134 F.3d 1054, 1061 (11th Cir. 1998) (Cox, J., concurring specially); *Kaplan*, 514 U.S. at 944. In this case, Alabama law governs the question of contract formation.[5] "If the making of the arbitration agreement . . . [is] in issue, the court shall proceed summarily to the trial thereof." 9 U.S.C. § 4; *Granite Rock Co. v. Int'l Broth. of Teamsters*, 130 S. Ct. 2847, 2859 & n.8 (2010).

---

[5]The SOLUTIONS handbook provides that New York law, without regard to its choice of law principles, shall be applied in construing and interpreting the agreement. (Doc. 8-2 at 11.) However, a court cannot sensibly apply a contractual choice-of-law provision before the court determines that the parties have a valid contract. *Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 119 (2d Cir. 2012) ("Applying the choice-of-law clause to resolve the contract formation issue would presume the applicability of a provision before its adoption by the parties has been established." (citing *Trans–Tec Asia v. M/V Harmony Container*, 518 F.3d 1120, 1124 (9th Cir. 2008) ("[W]e cannot rely on the choice of law provision until we have decided, as a matter of law, that such a provision was a valid contractual term and was legitimately incorporated into the parties' contract."))); *B–S Steel of Kansas, Inc. v. Texas Indus., Inc.,* 439 F.3d 653, 661 n.9 (10th Cir. 2006) (referring to "the logical flaw inherent in applying a contractual choice of law provision before determining whether the underlying contract is valid"). The law of the state where the parties were located at the time of the alleged agreement applies. *Schnabel*, 697 F.3d at 119.

## DISCUSSION

The "party seeking to compel arbitration must prove . . . the existence of a contract." *Owens v. Coosa Valley Health Care, Inc.*, 890 So. 2d 983, 986 (Ala. 2004).[6] The requisite elements of a contract under Alabama law are offer, acceptance, consideration, and mutual assent to the terms essential to the formation of a contract. *S. Energy Homes, Inc. v. Hennis*, 776 So. 2d 105, 108 (Ala. 2000). Defendant relies on the Alabama Supreme Court decisions of *Hoffman–La Roche, Inc. v. Campbell*, 512 So.2d 725 (Ala.1987) [hereinafter *Hoffman-La Roche*], and *Baptist Health System, Inc. v. Mack*, 860 So. 2d 1265 (Ala. 2003) [hereinafter *Baptist Health*], for the proposition that by signing the Acknowledgment Form and continuing her employment, plaintiff agreed to arbitrate her claims as described in the SOLUTIONS handbook.

### A.    The *Hoffman–La Roche* Regime

In *Hoffman–La Roche*, the Alabama Supreme Court held that provisions contained in an employee handbook may, in some situations, "constitute an offer to create a binding unilateral contract" between the employer and employee. 512 So. 2d at 735. Whether an implied contract arises under these circumstances, the court explained, is determined by applying the following four-part analysis of offer, communication, acceptance, and consideration:

---

[6]Because the burden is on defendant, the analysis below entertains arguments that plaintiff, proceeding pro se, did not make.

> First, the language contained in the handbook must be examined to see if it is specific enough to constitute an offer. Second, the offer must have been communicated to the employee by issuance of the handbook, or otherwise. Third, the employee must have accepted the offer by retaining employment after he has become generally aware of the offer. His actual performance supplies the necessary consideration.

*Id.*

Discussing the element of offer, the court found that "to become a binding promise, the language used . . . must be specific enough to constitute an actual offer rather than a mere general statement of policy." *Id.* at 734. Whether an offer exists "is determined by the outward manifestations of the parties, rather than by their uncommunicated beliefs." *Id.*

In discussing the element of communication, the court analyzed precedent in which an employer "published" and "posted through the plant" a "notice" stating the material terms of an offer. *See id.* at 732-33 (quoting *Henderson Land & Lumber Co. v. Barber*, 17 Ala. App. 337, 85 So. 35 (1920)). It concluded that in light of *Barber*, there was "no reason why a policy contained in an employee manual issued to an employee," as opposed to a published, posted notice, "cannot become a binding promise . . . ." *Hoffman–La Roche*, 512 So. 2d at 733. In other words, it does not matter "that the promise is communicated to the employee through the medium of a handbook, rather than by some other means" (as in, other *more patent* means). *Id.* at 733-734.

8

"Under this analysis, it does not matter whether the offer is made at the time of original hiring or after the employee has been hired" because, in either context, the employee's continuation of employment supplies the necessary consideration. *Id*. at 734 n.3.

**B.     The Spectrum of Employer-Employee Offers**

As is often true, this case falls somewhere on a spectrum created by precedent. The spectrum weighs the strength of the communication to an employee about the terms of a proposed agreement. The spectrum is discussed in *Baptist Health*, and it is helpful to illustrate it here. At the far end of the spectrum are agreements involving parties who sign explicit agreements to arbitrate. Then there are two cases, *Baptist Health* and *Hoffman-La Roche*, where the court held it sufficient for the employer to give the employee a document containing the specific terms that are sought to be enforced, although in *Baptist Health* the employer did more than simply that. Finally, there is a case where the court enforced against the employer a policy that was detailed in an employee handbook not issued to the employee, but the terms of which had been orally communicated to the employees by their supervisors and had been followed in the past as a "course of dealings." *Ex parte Amoco Fabrics and Fibers Co.*, 729 So. 2d 336, 340 (Ala. 1998).

### i. Signed Agreements

In *Ex Parte Beasley,* 712 So. 2d 338, 341 (Ala. 1998), the court hypothesized in dictum that  "the acknowledgment form contained in [the employer's] standard employee handbook would have created a binding obligation to arbitrate . . . if Beasley had signed that

form . . . ." The form required the signor to attest: "I also understand that as a condition of employment and continued employment I agree to submit any complaints to [arbitration] and agree to abide by *and accept* the final decision of the arbitration panel." *Id.* at 340 (emphasis added). The hypothetical in *Beasley* became a reality in *Kelly v. UHC Management Co*., 967 F. Supp. 1240, 1243 (N.D. Ala. 1997), where the employee received a handbook detailing an ADR program and signed a form providing:  "I agree to submit all employment related disputes based on a legal claim to arbitration." At the top of the signed page the form stated: "I understand that arbitration is the final, exclusive and required forum for the resolution of all employment related disputes which are based on a legal claim." *Id.* at 1256. The court held that "the acknowledgment forms that plaintiffs signed made it clear that arbitration was the exclusive method by which they could resolve . . . claims . . . ." *Id.*

Strong, specific language accompanied by the employee's signature in close proximity is likely the safest, most explicit way to ensure that an employee will be bound to arbitrate a dispute with an employer.[7] But that is not always necessary.

### ii. Receipt of the Document Sufficient

Similar to *Beasley* and *Kelly* is *Baptist Health*. In *Baptist Health*, the employee "received a copy of a Program document" stating that "[t]his Program precludes an employee and [the employer] from going to court to have disputes heard by a judge or jury. . . . By

---

[7]One court concluded that the formation of an arbitration agreement is rarely at issue because "virtually all employers require signed contracts or acknowledgment forms." *See Owen v. MBPXL Corp.*, 173 F. Supp. 2d 905, 923 (N.D. Iowa 2001) (citing cases).

remaining or becoming employed after receiving notice of this Program, you consent to resolution by arbitration of any dispute . . . ." *Baptist Health Sys., Inc. v. Mack*, 860 So. 2d 1265, 1267-68 (Ala. 2003). Although the court based its finding of the existence of an offer and acceptance on the receipt of the Program document alone,[8] the employee also signed an acknowledgment form that read:

> I acknowledge receipt of the BHS Dispute Resolution Program document. I understand I am *obligated to read* this document as it *governs* my continued employment and ***all future legal disputes*** between me and Baptist Health System as defined in the document. I understand that it is my *responsibility to consult* my Human Resource director if I have any questions.

*Id.* at 1268 (emphasis added). In addition, "meetings were held with the employees to explain the terms of the Program and to ensure that BHS employees were aware of the Program and the arbitration provision contained in the Program document." *Id.* at 1268-69.

In *Hoffman-La Roche*, the landmark Alabama case enforcing terms contained in an employee handbook, the employee was personally issued the handbook and continued working, which the handbook stated would manifest acceptance of the terms therein. *Hoffman-La Roche, Inc. v. Campbell*, 512 So. 2d 725, 737 (Ala. 1987). The parties did not

---

[8]*See id.* at 1274 ("Thus, we conclude that [plaintiff], by continuing her employment with [defendant] subsequent to her receipt of the Program document, expressly assented to the terms of the Program document . . . .").

sign any acknowledgments. The important factors were that the promise was specific, and that it was communicated.[9] *Id.* at 734-35.

### iii. Oral Communication Plus Course of Dealings

Finally, in *Ex parte Amoco Fabrics and Fibers Company*, 729 So. 2d 336 (Ala. 1998), two employees sought to enforce as an agreement a seniority policy. The full terms of the policy were contained in a policy-and-procedure manual, but that manual was only issued to supervisors (which the plaintiff employees were not). *Id.* at 337-338. Instead, the employees' supervisors "briefed them on the layoff/reduction-in-workforce policy and told them how it worked." *Id.* at 338. The policy was "communicated . . . to them as a benefit of employment, and . . . [the defendant employer] followed the seniority policy during [one of the employee's] employment" as a "course of dealings." *Id.* at 340. The court did not find it problematic that the policy-and-procedure manual was not distributed to the employees, since "both testified in their depositions that their supervisors informed them of the layoff-reduction-in-workforce policy," the employees were told when they began their employment "that all layoffs were done according to seniority," and the course of dealings evidence was "most compelling." *Id.* at 340 & n.3. In other words, the communication of the offer was still clear. The four-Justice dissent would have held that no agreement existed, since the employer

---

[9]A wrinkle should be noted in discussing *Hoffman-La Roche*. There, the party seeking recognition and enforcement of a contract was the employee. The agreement sought to be enforced was that the employee's status was not "at will," but "permanent." It seems easier to hold the drafter of an alleged contract to its terms than it is to hold an offeree to the terms of an alleged unilateral offer.

"did not actively disseminate" its policy-and-procedure manual to the employees, *id.* at 341, and the documents that the employees were given did not contain the specific policy at issue, which "should have alerted" the employees that it was not truly an offer, *id.* at 342.

**C.    Did Plaintiff Agree to Arbitrate Her Claims Through SOLUTIONS?**

The above spectrum demonstrates how far employers have gone to ensure their employees are aware of the terms of a deal that they can accept merely by not objecting, or how much courts have required before enforcing an "offer" against an employer. Defendant suggests that this case should fall somewhere close to *Baptist Health* on the spectrum. (Doc. 8 at 11.) The court agrees that this case and *Baptist Health* are similar in some respects, namely, in the specificity of their handbook's language.  Both provide specific terms of a proposed agreement.  The SOLUTIONS handbook provides: "This Procedure . . . creates a binding obligation on Covered Employees and the company for the resolution of employment disputes," (doc. 8-2 at 3), and "Covered Employees and the Company are not allowed to litigate a Covered Claim in any court," (*id.* at 8). However, these cases differ in a crucial respect: communication.

An employer satisfies the second element of the *Hoffman La-Roche* test by communicating its offer through "issuance of the handbook, or otherwise." *Hoffman–La Roche*, 512 So. 2d at 735. "The offer . . . must be communicated to the offeree," *id*. at 731, because "[a]s a general principle, an offeree cannot actually assent to an offer unless he knows of its existence." 1 WILLISTON ON CONTRACTS § 4:16 (4th ed.). "In the parlance of

13

contract law, communication of the offer is a prerequisite to the parties reaching a 'meeting of the minds.'" *Owen v. MBPXL Corp.*, 173 F. Supp. 2d 905, 921 (N.D. Iowa 2001) (citing RESTATEMENT (SECOND) OF CONTRACTS § 17, cmt. c (1981)).

The employer in *Baptist Health* met *Hoffman-La Roche*'s offer and communication requirement by issuing a copy of the Program document to its employees that states in clear terms that: a) arbitration is mandatory and binding; and b) acceptance of this agreement is manifested by continuing to work. *Baptist Health*, 860 So. 2d at 1275. But the employer in *Baptist Health* went further: it had the plaintiff acknowledge her receipt of and obligation to read the Program document. *Id.* at 1268. The signed acknowledgment included language suggesting that the plaintiff was making an important decision concerning "all future legal disputes." *Id.* Finally, the employer conducted meetings to educate its employees on the Program and its mandatory arbitration provision. *Id.* at 1268-69.

On the record before the court, defendant did far less in this case. Defendant claims that it communicated notice of the offer contained in the SOLUTIONS handbook through three documents: (1) a single-page SOLUTIONS Overview distributed to the employees, including instructions on where to obtain additional information, for which plaintiff signed a form acknowledging her receipt; (2) a virtually identical overview of SOLUTIONS in the Decatur plant Newsletter distributed to employees, except that the top of the Newsletter says: "all U.S. employees based in the U.S. . . . or elsewhere (hourly or salary) who continue their employment[] will be deemed covered by this procedure"; and (3)  a detailed handbook

containing the complete substance of the SOLUTIONS program kept in the HR office. What the defendant did not do, for whatever reason, was distribute the SOLUTIONS handbook to its employees.

*Issuance* of the handbook or the document containing the specific language forming the contract was crucial to the holdings in *Baptist Health* and *Hoffman-La Roche*.[10] *See Baptist Health*, 860 So. 2d at 1274 ("[W]e conclude that [plaintiff], by continuing her employment with [defendant] subsequent to her receipt of the Program document, expressly assented to the terms . . . ."); *see generally Hoffman-La Roche*, 512 So.2d 725 (mentioning the word "issuance" seven times, including in the summary of the framework itself). As discussed above, the court was explaining why giving a copy of the offer to the employee was a sufficient alternative to posting a notice of a specific offer around the workplace. *Id.* at 733-35. The court did approve of communication "by issuance of the handbook, or otherwise," *id.* at 735, and did say that it did not matter that communication was "through the medium of a handbook, rather than by some other means," *id.* at 734. But in saying "or otherwise" and "rather than by some other means," the court was not creating a catch-all provision, enabling employers to legally "communicate" unilateral offers by including them

---

[10]The court in *Hoffman-La Roche* modeled its opinion on a Supreme Court of Minnesota case. In introducing the issue, it quoted from that case verbatim the following: "If the handbook language constitutes an offer, and the offer has been *communicated by dissemination of the handbook to the employee*, the next question is whether there has been an acceptance of the offer and consideration furnished for its enforceability." *Hoffman-La Roche*, 512 So. 2d at 731 (quoting *Pine River State Bank v. Mettille*, 333 N.W.2d 622, 626-27 (Minn. 1983)) (emphasis added).

in a 30-page document and keeping it in a management-level office.[11] *See id.* at 734-35. It was referring to publishing and posting the offer throughout the workplace. *Id.* When someone is issued a physical, personal copy of a substantial document to take home, it is a signal that they need to be aware of the information contained therein because it is important. The implication is that they have to make personal–perhaps even legal–decisions regarding the information. And issuance of a personal, physical copy means that the communication travels directly from the employer to the employee without the employee having to do anything.

Compare that communication to the alleged communication in this case. To receive a communication of a specific offer here, the employee has to seek it out. The employee has to think—during work—either immediately upon reading the Newsletter or the Acknowledgment Form, or later, spontaneously, "Should I look up something else in the HR office regarding that form we signed?" Only by taking that affirmative step—not to simply read what was given (which is a natural impulse and, often, a legal presumption), but to remember, locate, and obtain something—would an employee ever come across language explaining that arbitration is mandatory and binding, and that working constitutes acceptance of that offer.[12] By failing to *issue* plaintiff a handbook, defendant did not "communicate" any

---

[11]In *Ex parte Amoco Fabrics and Fibers Company*, 729 So. 2d 336, 340 (Ala. 1998),"or otherwise" was met through the employee's testimony that their supervisors had briefed them on how the policy worked, and that the policy had been followed in the past.

[12]There is no evidence in the record that defendant's employees were trained or instructed on the SOLUTIONS program. Although there is no evidence that would impute

terms contained in the handbook to plaintiff, and therefore defendant cannot rely on the handbook or its terms as presumptive evidence of an offer or its communication. It would be unreasonable to suggest, even as a presumption of law, that she knew of the existence of an offer contained therein. *See* 1 WILLISTON ON CONTRACTS § 4:16 (4th ed.). Rather, the terms in the handbook kept in the HR office are exactly the sort of "uncommunicated beliefs" that the court in *Hoffman-La Roche* stated would not be evidence of an offer. *Hoffman-La Roche*, 512 So. 2d at 734.

And what defendant did communicate to plaintiff, far from being specific enough to form an offer, the acceptance of which would conclude the deal, does not even raise any red flags like the signed form should have in *Baptist Health*. A red flag might have provided the crucial link to argue that the Overview and the handbook kept in the HR office should be combined to form a unified, specific communication. Just three words might have been sufficient: "mandatory, binding arbitration." Instead, the one-page[13] Overview introduces a program that defendant advertises "will supplement, not replace, other processes, including" a brief, apparently non-exhaustive list of internal processes already in place. (Doc. 8-4 at 2) (emphasis in original). The most obvious "other process" to a dispute–what an "Alternative Dispute Resolution Program" is an "alternative" to, a lawsuit–is referenced in passing by

---

knowledge of the terms of the program to plaintiff, there is evidence that plaintiff knew about the existence of the program and received the one-page Overview. (*See* doc. 8-4 at 3; doc. 11 at 1.)

[13]The bottom-right pagination indicates that it may have been a four-page overview. (Doc. 8-4 at 2.) Either way, defendant is only relying on the selected page it attached to its brief.

stating that "[e]mployees *may* raise **covered claims only** (claims involving legally protected rights such as employment discrimination, layoffs, and discharges) at Level III and Level IV." (Doc. 8-4 at 2) (italicized emphasis added). The court must determine whether that language is specific enough to constitute an offer.

"Only" could refer to "covered claims," meaning that only covered claims, not other kinds of claims, were eligible for Level III and Level IV.[14] Other claims, it would seem, General Electric had not deemed important enough to be provided (presumably at General Electric's own expense) additional levels of process. Or it could mean that only when an employee has a "covered claim" *may* (since everything is framed permissively in the document) the employee bypass the Informal Process, Level I, and Level II, and raise that claim in Level III.

Alternatively, "only" could refer to "raise," meaning that covered claims can only be raised—addressed for the first time—"at Level III and Level IV."[15] By one definition, to "raise" a claim is to "bring [it] up for discussion or consideration; to introduce [it] or put [it]

---

[14]A close look at the SOLUTIONS handbook reveals that this is the correct interpretation of that clause: "If the employee is not satisfied with the outcome of Levels I and II, and the concern is a Covered Claim, the employee may submit the claim to Level III." (Doc. 8-2 at 3.) However, the court is reading the Overview as one would who was only given the Overview, searching for possible interpretations.

[15]Another look at the SOLUTIONS handbook reveals that this is the incorrect interpretation of that clause: "The levels of Solutions are in a logical sequence, and employees must complete each level of the process before proceeding to the next level." (Doc. 8-2 at 3.) The same caveat from the previous footnote applies.

forward." BLACK'S LAW DICTIONARY 1373 (9th ed. 2009). So if an employee can only bring up a covered claim for consideration at Level III—i.e., in SOLUTIONS—then the SOLUTIONS ADR Process would be mandatory. An employee could not race to the courthouse and file a lawsuit involving a covered claim without having *initially* introduced it in SOLUTIONS. However, a lawsuit would presumably be available after the Process was exhausted to challenge the decision rendered in arbitration. In other words, decisions reached in the Process are not *binding*.[16] But since SOLUTIONS is presented merely as a "supplement" to "other processes," it makes more sense that "raise" means merely raise in the SOLUTIONS process. Therefore, covered claims, if raised in the SOLUTIONS process at all, can only be raised at Level III and IV. But having "only" refer to "raise" doesn't make sense in the context of the whole Overview, because "any claim" can be raised "during the Informal Process or at Level I and Level II." And if any claim can be raised then, how could a covered claim be raised *only* at "Level III or Level IV?" Also, reading "only" to refer to "raise" is awkward because "may . . . only" would be such a roundabout way of saying something that is straightforward: "must."

Of course, the court is not interpreting a contract on which a signature meant agreement to the substance of the expressed terms. Then such verbal calisthenics would be justified to determine the exact meaning of the terms. Rather, the court is reading a form that

_____

[16]Although arbitration "normally means binding arbitration," *Dow Corning Corp. v. Safety Nat'l Cas. Corp*., 335 F.3d 742, 746 (8th Cir. 2003), it is not within the province of most lay persons to understand this without explanation.

does not purport to be a contract, but an "overview," on which a signature "*simply* states that [the signing employee] *received* an overview and instructions on how to access additional details of the program." (Doc. 8-4 at 2) (emphasis added). The signature does not acknowledge any substantive terms, such as that the document, or any other document in defendant's possession that perhaps could have been incorporated by reference, "governs my continued employment and all future legal disputes." *Baptist Health*, 860 So. 2d at 1268. The calisthenics do not prove one interpretation over another, but they do prove all that is necessary on this Motion: that the Overview was not an offer "communicated" to plaintiff "specific enough to constitute an actual offer rather than a mere general statement of policy." *Hoffman-La Roche*, 512 So. 2d at 734. Thus, the Overview does not prove the existence of an agreement.

Outside of the handbook, which was not communicated to plaintiff, and the Overview, which is not specific enough to be an offer, defendant has little else on which to rely to form a communicated offer. It has the language from the top of the Newsletter, removed, for whatever reason, from the signed Overview, which states that all employees "who continue their employment[] will be deemed covered by this procedure," but that is not specific enough either. (Doc. 8-3 at 2.) Being "covered" by a program framed as a permissive alternative does not even hint at a possibility that the employee could be forsaking all traditional legal process. It does not suggest that the employee is agreeing to anything, much less to give something up. "Covered" suggests that, like a free insurance policy, as long as

the employee works, he or she is covered by the process if needed. Even if the "covered by" language was specific enough to constitute an offer of binding, mandatory arbitration, which it is not, this case would still be distinguishable from other precedent. Unlike signed documents or employee handbooks, newsletters are not the sort of documents that one would expect to contain binding agreements. They are the sort of documents that people glance at and throw away. There is no basis for presuming that an employee read and agreed to the contents of a newsletter, especially if the clause at issue is on "page 6" of the newsletter. (*See* doc. 8-3 at 2.)

There is another precedent, albeit not from Alabama law, in which an employer enclosed a brochure in all "new-hire packets" that included the following language: "Binding arbitration is a legal process much like a court, but is much faster and less costly. You and the [employer] will be bound by the decision . . . ." *HSS Systems, LLC v. Lucan*, No. 03-10-00761-CV, 2011 WL 2297716, at *1-2 (Tex. Ct. App. June 9, 2011). In addition, the full policy, entitled "Mandatory Binding Arbitration Policy," was posted on the employer's intranet. *Id.* at *4. Finally, there was evidence that the HR manager during the new-hire presentation "alerted the employees that mandatory arbitration was the final step in the dispute resolution process . . . that arbitration was required in lieu of going to court . . . [and that] by coming to work . . . the employees were accepting all of the policies discussed, including arbitration," although the plaintiff claimed that the presentation did not "involve

21

any significant discussion of arbitration." *Id.* at *2. The present case involves significantly less communication than was shown in *Lucan*, and the *Lucan* court held that notice of the arbitration policy was not "unequivocal"[17] and affirmed the trial court's denial of the defendant's motion to compel arbitration. *See id.* at *5.

## **<u>CONCLUSION</u>**

Reviewing the evidence before the court, defendant met some of the requirements in *Hoffman-La Roche* sometimes, but it never met all of them at once. When it wrote language specific enough to constitute an offer, it did not actually communicate that offer. When it actually communicated, it did not use language specific enough to constitute an offer.

Because the court finds that defendant has not proven that the parties agreed to arbitrate this dispute, it does not address whether the terms of SOLUTIONS are reasonable and fair. Since plaintiff did not demand a jury trial on the issue, the court will hold a hearing to determine whether the parties in fact agreed to arbitrate this dispute. 9 U.S.C. § 4.

---

[17]While the *Lucan* court spoke in terms of "unequivocal notice," *Lucan*, 2011 WL 2297716, at *5, instead of a "communication" that is "specific enough to constitute an actual offer rather than a mere general statement of policy," *Hoffman-La Roche*, 512 So. 2d at 734, the tests are similar enough for illustrative purposes.

For the reasons stated above, defendant's Motion to Dismiss, or, in the Alternative to Stay this Action and to Compel Arbitration is due to be denied.

**DONE** this 28th day of March, 2014.

*Sharon Lovelace Blackburn*

SHARON  LOVELACE  BLACKBURN
UNITED STATES DISTRICT JUDGE

23